Filed 7/17/15  P. v. Pimentel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PATRICIA PIMENTEL,<br><br>    Defendant and Appellant. | F067659<br><br>(Super. Ct. No. BF144335A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Law Offices of Joy A. Maulitz and Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Patricia Pimentel guilty of child abuse (Pen. Code, § 273a, subd. (a)),[1] but could not reach a decision on the special allegation of infliction of great bodily injury on a child under the age of five years (§ 12022.7, subd. (d)). At the sentencing hearing, the People dismissed the allegation of great bodily injury, and Pimentel was placed on probation for four years and ordered to serve one year in county jail.

In this appeal, Pimentel contends she received ineffective assistance of counsel when her attorney failed to ensure that reference to a prior Child Protective Services (CPS) report was kept from the jury. In addition, she contends the trial court abused its discretion by denying her motion to reduce the conviction to a misdemeanor, and she claims the search condition of her probation is unconstitutional.

We affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

In November 2012, the Kern County District Attorney filed an information against Pimentel charging her with a single count of causing or permitting her son, A., to be inflicted with unjustifiable physical pain or mental suffering. It was further alleged that Pimentel personally inflicted great bodily injury upon A.

On May 28, 2013, Pimentel filed a motion in limine to exclude, among other things, "evidence of prior bad acts committed by [Pimentel] against her children." She specifically identified three occasions of prior bad acts. First, Pimentel told a social worker in 2006 that she heard voices telling her to kill her daughter, D., and that she would put her hand over D.'s mouth to prevent her from breathing. Second, in late 2011, when A. was one month old, he fell off a couch while in Pimentel's care and an ambulance had to be called. Third, Pimentel told a social worker in April 2012 that she accidentally ate a marijuana-laced brownie prior to breastfeeding A. She argued that

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

2.

evidence of these incidents was irrelevant, constituted improper character evidence, and (to the extent it might be relevant) was substantially more prejudicial than probative.

The People separately filed a motion in limine seeking to *admit* evidence that Pimentel tried to suffocate her first infant child in 2006. The trial court agreed with Pimentel that the probative value of evidence that she tried to suffocate her child in 2006 was substantially outweighed by the prejudicial effect. The court denied the People's motion and granted Pimentel's motion to exclude evidence of prior bad acts committed by Pimentel against her children.

## Prosecution

On July 9, 2012, Jed Grant was working as physician's assistant in the emergency department at San Joaquin Community Hospital in Bakersfield. That day, Pimentel brought A., who was about seven months old, to the emergency department because he had pain in his right arm. Grant met Pimentel around 4:00 p.m. She told Grant that A. had been suffering arm pain and was not using his arm normally since she had picked him up from a friend who had been watching the child. Pimentel said she did not know how the injury occurred because the child was being watched by a neighbor.

Grant observed swelling above A.'s right elbow. He tested A.'s range of motion and ordered X-rays. A radiologist reviewed the X-rays and diagnosed a spiral fracture of the mid to distal humeral diaphysis, the long part of the bone between the elbow and the shoulder. Grant testified that a spiral fracture would usually require the limb to be caught in something or grasped and twisted and the injury can be consistent with child abuse.

After receiving the X-rays and diagnosis, Grant told Pimentel that A. had a spiral fracture, and he asked again how the injury occurred. Pimentel seemed upset. She said she did not know how the injury occurred because A. was at a friend's house. She said A. was fine when she dropped him off and when she picked him up he was not using his arm correctly.

About 5:40 p.m., Grant contacted the Kern County Sheriff's Office because, he explained, "we didn't have a good reason for how the fracture occurred." He also ordered a skeletal survey, described as "like an entire body scan." No other fractures were found. Grant spoke to law enforcement, and A. was discharged from the hospital at 7:27 p.m.

Kern County Sheriff's Deputy Brian Hartley and his Field Training Officer, Deputy Braydon Ferguson, were dispatched to San Joaquin Community Hospital around 6:30 p.m. for a possible child abuse case. Hartley spoke with Grant and Pimentel and saw A. at the hospital. Pimentel told Hartley she left A. with neighbors while she went job hunting. She said the neighbors were Mark and Marissa, who lived in an apartment directly above hers. She told Hartley she felt comfortable leaving A. with her neighbors because she had known them for two years. Pimentel said she noticed A.'s arm was injured and talked to Mark and Marissa. They said her son was playing with other kids and the kids must have been playing rough. Pimentel said she took A. to the hospital within a half-hour of noticing the injury.

Hartley then went to the address Pimentel gave for Mark and Marissa. No one answered the door, and the apartment appeared to be vacant. While Hartley was knocking on the door, neighbors asked who he was looking for and told him that Mark and Marissa moved out about a month or two earlier. They told him the apartment was vacant.[2]

Hartley went downstairs to Pimentel's apartment and knocked on the door. A boy who identified himself as Freddie and appeared to be about 16 years old answered the door. Pimentel and A. were not home. Hartley called Pimentel; she told him she was waiting at the hospital for discharge papers and she would be home shortly. Later that

---

[2] Pimentel later confirmed there was "nobody there" upstairs and the former neighbors had been gone about two weeks.

evening, Hartley met Pimentel at her apartment. A. was not there. Pimentel told Hartley she had left A. with her mother. Hartley asked for her mother's telephone number, so he could check up on A. At that point, Hartley and Pimentel were speaking outside, near the front door of Pimentel's apartment. Pimentel hesitated, looked at Hartley, looked at her neighbors, and motioned for Hartley to go inside her apartment. When they were in her apartment, Pimentel said A. was not with her mother, he was with one of her friends. Hartley told her to call her friends and get A. home, so he could check on his welfare. Hartley did not ask for the names of the friends. Within about five or 10 minutes, a boy in his early teens showed up holding A. Hartley did not interview the boy.

Pimentel told Hartley that what she said at the hospital was not true. She said she caused A.'s injury, but it was an accident. She said she reached over the back of the couch to pick up A. off the couch. She was holding diapers and other items with her left arm, and she used her right arm to pick up A. She reenacted what happened, demonstrating that she grabbed A.'s right arm and twisted him up and held on to him. Pimentel did not think A. was injured at that time because he did not cry. She said that several minutes later, he started to cry and she became concerned.

Hartley called CPS. He felt A. was not safe with Pimentel because she had lied at the hospital. He was also concerned that she "pawned him off to some friends" right after A. was discharged from the hospital with an injury. After he called CPS, Hartley asked to interview Pimentel again using a digital recorder, and she agreed. Hartley testified that Pimentel was very cooperative and answered all of his questions. He attempted to record the interview, but the first half of the interview was not recorded. The part of the interview that was recorded was played for the jury. A CPS worker arrived and took custody of A.

In the recorded portion of the interview, Pimentel said she picked up A. because she did not want him to fall and she used one arm. A. was not crying. Later, she said, "when I was trying to feed him and stuff, and when I touched his arm or something, he

5.

was crying." She realized A. was hurt about five to 10 minutes after she picked him up. Her friend, Alicia, drove them to the hospital.[3] Hartley asked what Pimentel told medical staff. She responded, "That I left him with my friend … while I went … to do unemployment, to look for a house, and when I came back um, my friend told me that umm his kids were playing with him, so um, he probably got a little bit hurt. Cuz he kept crying when they touched his arm." Pimentel told Hartley she did go house hunting and to an appointment but she "lied about leaving him with a friend." Hartley asked why she lied, and Pimentel said, "Cuz I was afraid they were going to take my son." She said her friends, "Laesha, Freddie, and Aaron" were at home while she was at the hospital. Pimentel admitted she lied when she told Hartley that A. was with her mother. She stated that she had a seven-year-old daughter who lived with her mother.

The next day, July 10, 2012, Monica Goodell-Bonello, a social worker with the Department of Human Services (DHS), met with Pimentel at the DHS office. Pimentel told Goodell-Bonello she had an appointment the previous day at 1:30 p.m. with HEAP for assistance to pay her PG&E bills and then she went to look at a couple of apartments because she was planning to move. She left A. at home with her roommate, Laesha. Pimentel said she returned home around 2:15 or 2:30 p.m. A. was on the couch and he started to cry and fuss, and she went to grab him. She only had one arm free, and she picked him up by one arm. Pimentel heard a pop, but A. did not cry and she thought he was fine. She reported that Laesha was not present in the apartment at that time.

Pimentel further told Goodell-Bonello she lied to medical staff that A. was injured at a neighbor's home because she was afraid CPS would take him away. Goodell-

---

**3** We have listened closely to the recording and read the transcript, both of which are part of the record on appeal. According to the transcript, Pimentel said "Alicia" gave her a ride to the hospital. We hear either "Alicia" or "Aneesha." It does not sound like Pimentel said "Laesha," although we cannot rule out the possibility that she was referring to Laesha, whom she later identified as her roommate.

Bonello tried to contact Pimentel's purported roommate, Laesha, but Pimentel said she did not know Laesha's last name or how to contact with her.

Mitchell Adams, a Senior Deputy with the Kern County Sheriff's Office in the child abuse segment of the Detective Division, was assigned to follow up on A.'s case. On July 11, 2012, Adams interviewed Pimentel. The interview was recorded, and the recording was played for the jury. In the interview, Pimentel stated that A.'s father was "not in the picture" and that she did not know who he was. She told Adams her friend, Laesha, was staying at her home but she was "just staying for a few weeks."

Pimentel said that on the day A. was injured, she had an appointment. When she got home, she was trying to clean up and she had a lot of things in her arms. A. was on the couch and she did not want him to fall over. She grabbed him with one arm to set him in his crib. She heard something pop but he did not cry. A few minutes later, however, she noticed he was not lifting up his arm and, when she touched it, he would cry. So she took him to the hospital.

Pimentel said her friend, who was a next door neighbor, drove them to the hospital. Adams asked for the neighbor's name, and Pimentel responded, "That's a lot of information." She said a lot of people "around there" do not like to give their names. Then she said it was her roommate, Laesha, who gave her a ride.

Adams asked where Pimentel came up with the story that she left A. with a friend and kids may have injured him. She said she did not know and it "came in [her] head because [she] was afraid." Pimentel told Adams she already had a CPS report for her son. After they left the hospital, Pimentel gave A. to her friend because she was afraid he would be taken away. The friend was Laesha. Pimentel admitted that she lied to the deputies that she left A. with her mother and said, "I kept making up a bigger story."

Adams asked why she did not tell the deputies A. was with a friend. Pimentel responded that there were "a lot of things going through [her] head" because she had "been in the system." Pimentel demonstrated to Adams how she grabbed A. when he

was on the couch. She "felt something" and "heard something pop" and it "sounded like a bone." She did not think she broke A.'s arm, but she thought it popped out of place or was dislocated. Adams observed, "it takes quite a bit" to break an arm. Pimentel said, "It's cuz—when I pick him up he always moves. [¶] … [¶] So when he kicks his legs, he moves a lot." Adams asked if she had been "maybe a little rough," and she agreed, "probably a little bit." She said she had picked him up like that in the past "[a] lot" but nothing had ever happened. She said that sometimes she may not notice "how rough I am when I'm cleaning." Pimentel told Adams that she gets frustrated because she is a single mother doing everything at once. Adams referred to prior CPS reports on Pimentel, and she stated that she had anger and depression issues in the past.

For his investigation, Adams spoke to CPS workers and Pimentel. He did not interview any other witnesses, and he did not go to Pimentel's apartment complex to attempt to locate Laesha.

### *Defense*

Pimentel testified on her own behalf. At the time of trial, she was 21 years old and A. was 18 months old. She and A. moved into their apartment in early 2012. At first, just the two of them lived in the apartment. Pimentel was disabled and was not employed. Around April 2012, she took in roommates. They were Laesha Johnson, Ernest Lery, Aaron Cresswood, and Johnson's four children. Johnson's children were all under the age of ten. Johnson was in her late 20's, Lery was in his early 30's, and Cresswood was 16 years old at the time. Lery and Cresswood were brothers.

Pimentel met Lery the day she moved in because he was her neighbor in the apartment complex. Lery was living with Johnson, her children, and Cresswood. Lery was the father of two of Johnson's children. Lery and the others moved in with Pimentel because she "started being in a relationship" with Lery. She heard rumors about Lery being a pimp and she tried to end the relationship. At first, Lery was a "friend with benefits," but then Pimentel ended up working for Lery as a prostitute. Johnson was also

8.

a prostitute. When Pimentel would try to end her relationship with Lery, he would beat her.

Pimentel moved out of the apartment a few days or a week after A. was taken away on July 9, 2012. When she left the apartment, she did not take anything—no cell phone, clothes, or furniture.

On July 9, 2012, Pimentel went to a management company to see if she were qualified to rent a house. She also went "for the PG&E" at 1:00 p.m. She left A. at home because he had eczema and the sun irritated his skin. Before she left the apartment, A. was not injured. She left him with Lery and the other children. Cresswood and his friend, Freddie, were also in the apartment. Johnson drove Pimentel to her appointments. Pimentel did not know how to drive.

When Pimentel returned home, Lery was holding A. Johnson's children were also there. Pimentel noticed that A. looked sad. Pimentel testified that she did not allow Lery to touch her son because she did not trust him. Johnson's daughter told Pimentel, "'my daddy [Lery] hit your son.'" Pimentel asked Lery if he hit her son, and he did not respond. Pimentel then took A. to the hospital.

Pimentel testified that, when she spoke to Grant and Goodell-Bonello, she did not tell the truth because she was afraid of Lery. Lery would beat her "all the time." He had choked her and she had become unconscious. Pimentel also lied to Hartley when she spoke with him at the hospital. She testified that she lied because she was afraid of what might happen to her, A., and her family.

When A. was discharged from the hospital, Johnson gave Pimentel and A. a ride home. Johnson's children, along with Cresswood and Freddie, were at home, but Lery was no longer at the apartment. Hartley knocked on Pimentel's door about 15 to 20 minutes later. At that time, she was by herself in the apartment. She spoke with Hartley at her doorway. Pimentel asked Harley to come inside because Lery's sister and Lery's friends were nearby in the apartment complex. She told Hartley that A. was with

her mother, but this was not true. A. was with Cresswood's friend, but it was not Freddie. Pimentel did not recall the friend's name. Cresswood's friend and Johnson had taken A. and Johnson's children in a Dodge Durango. Pimentel did not know where they were going. Hartley told her to arrange to have her son returned, and Pimentel called Lery and told him to bring A.

After Pimentel and Hartley went in her apartment, Pimentel still did not tell Hartley the truth. At trial, Pimentel explained that she could not speak the truth because the door was open and Lery's sister "was right there." CPS workers arrived and took A., and the deputies left. Shortly after that, Lery, Johnson, her children, and Cresswood returned to the apartment. Pimentel started telling Lery she was angry, and he beat her.[4]

The next day, Johnson drove Pimentel to her appointment with Goodell-Bonello. The following day, Pimentel met with Adams. Pimentel did not tell the truth to Adams because she was afraid of Lery and because Johnson drove her to the appointment and sat next to her in the lobby. Pimentel described to Adams a scenario in which she injured her son (by grabbing him from the couch) based on what Grant had told her about how A.'s spiral fracture could have been caused by twisting. The scenario she described, however, did not happen. Pimentel denied breaking A.'s arm and denied ever picking him up in an awkward position.

Pimentel testified that she told the truth about A. to her foster mother, Vienna Fisher. This occurred about a week after A. was injured and after Pimentel left Lery. She told Fisher she believed Lery could have hurt A. Pimentel talked to her therapist, Angela Hernandez, and another mental health case worker about her situation. In September 2012, Pimentel told the truth about what happened to her attorney in the juvenile dependency case involving her son.

---

**4**     In cross-examination, Pimentel explained that Lery beat her in the head, but not the face, and he did not leave bruises a person would see.

Pimentel was arrested for prostitution in September 2012. She was arrested in this case in November 2012. She was not aware that there was a warrant for her arrest for child abuse, and she had visited A. at the DHS the day before her arrest.

Hernandez, a mental health therapist working for Kern County, had Pimentel as a client until March 2012 and, at the time of trial, had known Pimentel for six years. Hernandez testified that she talked to Pimentel at the end of October 2012 (when Pimentel was no longer her client). Pimentel told her a man who was living with her "was making her a prostitute." Pimentel also said A. had broken his arm, and she told Hernandez how she believed his arm was broken. Pimentel said she left A. at home with the man who was living with her and, when she returned, A. was crying and something was wrong with him. Pimentel took A. to the hospital.

Fisher testified that she had known Pimentel for six or seven years and that Pimentel was her foster daughter. About a week after A.'s injury, Pimentel told Fisher that she did not hurt A. She said her boyfriend had done it. Pimentel was crying and upset.

### Verdict and Sentence

The jury found Pimentel guilty of child abuse. It could not reach a decision on the allegation of personal infliction of great bodily injury, and the trial court declared a mistrial as to the enhancement. On July 2, 2013, Pimentel filed a motion to reduce the child abuse conviction to a misdemeanor pursuant to section 17, subdivision (b).

On July 8, 2013, the trial court denied Pimentel's motion to reduce the conviction to a misdemeanor. The court placed Pimentel on probation for a period of four years and ordered her to serve one year in the custody of the Kern County Sheriff.

Pimentel filed a notice of appeal on July 22, 2013.

11.

## DISCUSSION

### I. Ineffective assistance of counsel

As we have mentioned, the trial court granted Pimentel's motion in limine, ruling "evidence of prior bad acts committed by [Pimentel] against her children" was not admissible. On appeal, Pimentel contends her attorney provided ineffective assistance of counsel by failing to ensure that discussion of a prior CPS report was excised from a tape played for the jury. We disagree.

#### A. Background

On May 31, 2013, the parties discussed the audiotapes and transcripts of Pimentel's interviews with Hartley and Adams. The prosecutor raised the issue of redacting the interviews. She stated: "[T]here are a couple of transcripts in this case. I had some concerns, based on the Court's in limines, about mention of her first child in the first interview. She mentions the child a lot in her second interview, which I think we're going to need to talk about."

Pimentel's attorney responded that he was not concerned about Pimentel's statement to Hartley that she had an older daughter who lived with her mother. He explained that he did not think it was prejudicial.

As to the Adams interview, the prosecutor noted, "there is mention of that first child and the fact that she was taken away, I think several times throughout that interview, and that may be something that we need to [¶] … [¶] [e]xcise that out." She suggested Pimentel's attorney talk to her about "the areas he's got a problem with."

There is no further discussion on the record between the parties about redacting or excising the interview, but the recording and transcript evidently were edited for content. Before the jury heard the interview, the court stated: "It's going to be obvious … listening … to this, that this tape has been edited.… [¶] The law states you're not to hear certain testimony that's deemed irrelevant by me, so I've had that taken out."

During the interview, Pimentel said she told medical personnel she had left A. at a friend's house because she was afraid. The jury heard the following:

> "Adams:  Where did you come up with that story?
>
> "[Pimentel]:  I don't know. It just came to my head because I was afraid.
>
> "Adams:  I mean that just popped in your head? What were you afraid of?
>
> "[Pimentel]:  Cuz, um, *I already had a CPS report for my son*. It was just the fact that uh, they always bring a lot of things and every time … there's a CPS report, they always bring out the negative parts.
>
> "Adams:  Well, sure, sure they do.
>
> "[Pimentel]:  So that's, uh, that['s] why … [I] was scared that they bring out negative parts and no one sees the new stuff that I've been doing." (Italics added.)

In his closing statement, Pimentel's attorney referred to her experience with CPS. He argued to the jury:

> "If she had inflicted that injury on [A.], why would she immediately take him to the hospital? Wouldn't she be expected to try and conceal it by keeping [A.] and seeing if it was just a bruise or if it was just a sprain? Wouldn't she just keep him in the house and hope it's going to get better and not have to report it to anyone?
>
> "She knows if she goes into the hospital, they're likely to call the cops. You heard testimony she's dealt with CPS before. She's been through the system. If she broke [A.]'s arm, why would she rush him to the hospital right away … where it's going to be discovered right away her son's arm is broken?
>
> "The reason she took him into the hospital is because she cared for her son."

***B.*** ***Analysis***

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant .…" (*People v. Dennis* (1998) 17 Cal.4th 468, 540.)

"Our review is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective at the time. [Citation.] A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.]" (*People v. Dennis*, *supra*, 17 Cal.4th at p. 541.) "In general, reviewing courts defer to trial counsel's tactical decisions in assessing a claim of ineffective assistance, and the burden rests on the defendant to show that counsel's conduct falls outside the wide range of competent representation. [Citations.] In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.)

"When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the case is affirmed [citation]. In such cases, the ineffective-assistance claim is more appropriately made in a petition for habeas corpus. [Citations.]" (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.)

Pimentel argues that evidence of her previous dealing with CPS was irrelevant and inflammatory. She asserts defense counsel clearly viewed the evidence as extremely damaging, as he filed a motion in limine to exclude the evidence. She claims, "There

was no conceivable reason for defense counsel to allow the evidence to come in after he had litigated and won a motion to keep it out. Counsel's failure to follow through on this important ruling was inexcusable, and deprived [Pimentel] of her right to effective assistance of counsel."

As a preliminary matter, we question the premise of Pimentel's argument that her statements about a CPS report were covered by her motion in limine. She asked for the court to exclude any evidence of "prior bad acts committed by [her] against her children." Reference to prior contact with CPS regarding A., without more, was not evidence of prior bad acts committed by Pimentel against A.

In any event, we cannot say that Pimentel's attorney's conduct fell outside the wide range of competent representation. The attorney's rational tactical purpose in allowing reference to Pimentel's prior contact with CPS is demonstrated by the argument he made to the jury. He argued that if Pimentel had personally inflicted injury on A., she would not have taken him to the hospital because she would have known CPS would be involved.

Pimentel's attorney was faced with a client who offered three different stories about how her son was injured and who admittedly allowed her violent pimp to live with her and A. Attempting to present Pimentel in the best possible light given the circumstances, Pimentel's attorney decided to use her CPS history to bolster his argument that simply taking A. to the hospital was evidence that Pimentel had not injured him. Even if the jury believed Pimentel's trial testimony, she likely would be perceived as a flawed parent. Her attorney reasonably could have determined that the risk of prejudice from the reference to a prior CPS report was outweighed by its relevance to show that, in spite of her problems, Pimentel was a caring parent who would not hurt her child and would take him to the hospital if he were injured. Given the indisputable evidence that Pimentel lied at least twice about what happened to A., her attorney also may have thought evidence of her prior experience with CPS could help explain why she lied to

15.

medical personnel and law enforcement initially. Since we can imagine a rational tactical purpose for her attorney's conduct, Pimentel's claim of ineffective assistance of counsel fails.

## II. *Motion to reduce conviction to a misdemeanor*

Pimentel contends the trial court abused its discretion in denying her motion to reduce the conviction to a misdemeanor. We are not convinced.

### A. *Background*

On July 2, 2013, Pimentel filed a motion to reduce her conviction to a misdemeanor pursuant to section 17, subdivision (b). She argued the facts and circumstances of the case weighed strongly in favor of her request because she was only 20 years old at the time of the offense, she had little or no prior criminal history, and "[a]t worst, it appears that this crime was the result of a young mother who did not have the proper life skills to deal with being a single mother and who ended up harming her son by accident or through carelessness." She also briefly recounted her personal history of sexual abuse as a child, rejection by her parents, pregnancy at around 13 years old, and placement in foster care, and argued these circumstances militated in favor of lenience.

The trial court denied the motion. The court stated that it gave "serious consideration on what to do here." It considered "California Rules of Court, Rule [4.410], in addition to similar sentencing guidelines, the nature and circumstances of the offense here, [Pimentel's] appreciation of [and] attitude toward the offense, her trait[s] and character as evidence by her behavior and demeanor at trial."

The court explained:

> "There's no way I can send her to prison, in my mind, for what happened here. In my opinion, what happened here is we had a young, frustrated mother who picked her baby up wrong and broke the baby's arm. The problem … here is that she repeatedly lied about it to law enforcement and medical personnel before she finally came clean.

16.

"And I read the probation officer's report. They interviewed her about it, and she continues to deny committing the crime. She said, 'I didn't hurt my son. I'm doing someone else's crime. I'm guilty of neglect but not what they're charging me.' So in light of the *Alvarez*[5] case, it states whether or not the defendant's appreciation of [and] attitude toward the offense, I don't see it.

"I certainly wish she had taken a different tack here, admitted her offense and was ready to move on but she's not. So, again, under California Rule[s] of Court[, rule 4.410 and] the *Alvarez* case, it's not a prison case but I'm not prepared to reduce it to a misdemeanor.

"I don't think she falls in that particular category but it's close for a young mother picking her … child up incorrectly and breaking the arm. The way … the testimony was of how she picked the baby up, twisting the baby and causing the spiral fracture to the arm. I'll deny the motion." (Italics added, underscoring omitted.)

### B.    Analysis

Pimentel was convicted of violation of section 273a, subdivision (a). This offense is punishable by imprisonment in county jail not exceeding one year, or in state prison for two, four, or six years, making the offense a "wobbler."[6] (§ 273a, subd. (a).)

Under section 17, subdivision (b), a trial court has discretion to reduce a wobbler to a misdemeanor. (See *Park*, *supra*, 56 Cal.4th at p. 790.) We review a trial court's sentencing decision under section 17 for abuse of discretion. (*Alvarez*, *supra*, 14 Cal.4th at p. 977.) Although a trial court is granted "broad authority" by section 17, subdivision (b), a sentencing decision under the statute must be based on "individualized consideration of the offense, the offender, and the public interest." (*Alvarez*, *supra*, at

---

5    *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 (*Alvarez*).

6    "The Legislature has classified most crimes as *either* a felony or a misdemeanor, by explicitly labeling the crime as such, or by the punishment prescribed.… There is, however, a special class of crimes involving conduct that varies widely in its level of seriousness. Such crimes, commonly referred to as 'wobbler[s]' [citation], are chargeable or, in the discretion of the court, punishable as either a felony *or* a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine. [Citations.]" (*People v. Park* (2013) 56 Cal.4th 782, 789 (*Park*).)

p. 978.)  Relevant considerations include "'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial'" and, when appropriate, "the general objectives of sentencing such as those set forth in California Rules of Court, rule [4.410]."  (*Alvarez*, *supra*, at p. 978.)

We discern no abuse of discretion in this case.  The trial court stated the appropriate considerations for deciding a motion under section 17, subdivision (b), and properly based its decision on Pimentel's appreciation of and attitude toward the offense.  After hearing all the testimony at trial and reviewing the probation officer's report, the court determined Pimentel personally injured A. by picking him up "wrong," lied to medical personnel and law enforcement about what happened, and continues to deny that she committed the crime.  Under the circumstances, the court decided Pimentel's "appreciation of an[d] attitude toward the offense" (or rather her failure to appreciate and acknowledge her offense) did not warrant a reduction of her conviction to a misdemeanor.

Pimentel argues that because the evidence of guilt was not overwhelming, the trial court should not have relied on her continued denial of guilt in deciding the motion.  She cites *People v. Key* (1984) 153 Cal.App.3d 888, but the case is inapposite.  In *Key*, the Court of Appeal held that lack of remorse was not a valid reason to *aggravate* a sentence in a case where the defendant denied committing the crimes and the evidence was not overwhelming.  (*Id*. at pp. 900–901; see Cal. Rules of Court, rule 4.421 [identifying circumstances in aggravation without mention of the defendant's lack of remorse or denial of guilt].)  The Court of Appeal, however, did not have occasion to consider whether a defendant's lies[7] and denial of guilt may be considered by a trial court deciding a request to reduce a conviction to a misdemeanor.

---

**7**    On appeal, Pimentel does not dispute that she lied to medical personnel and law enforcement about what happened to A.

Pimentel offers no other legal authority for her position. Without such authority, we decline to hold that the trial court abused its discretion when it denied her request to reduce her conviction to a misdemeanor by relying on the facts (1) Pimentel lied to medical personnel and law enforcement the day A. was injured and (2) she continues to deny she personally harmed her son. These facts are related to Pimentel's appreciation of and attitude toward the offense and are appropriate individualized considerations on which to base a decision under section 17, subdivision (b). (See *Alvarez*, *supra*, 14 Cal.4th at p. 978.)

### III. *Probation condition*

At the sentencing hearing, the trial court granted probation with terms and conditions including the following: "That she permit her person, residence, motor vehicle, and/or possessions to be inspected or searched for narcotics or dangerous drugs by a probation officer or any law enforcement officer at anytime [*sic*] during her probationary term and without prior notice of intent to inspect or search, with or without a search warrant, warrant of arrest or reasonable cause." Pimentel did not raise an objection to this or any of the probation conditions at the hearing.

Now, Pimentel contends the search condition is unreasonable and violates her federal constitutional rights. We reject this contention because Pimentel forfeited the issue and the contention fails on the merits.

Pimentel claims, "Although search conditions are frequently imposed in cases involving narcotics or weapons, it makes no sense to impose a search condition in a case like this one, in which [Pimentel]—who had no criminal record—picked up her child the wrong way off a couch." This is an argument that the search condition was unreasonable because it was not related to the crime of which Pimentel was convicted. In *People v. Welch* (1993) 5 Cal.4th 228 (*Welch*), however, our Supreme Court held that failure to raise a timely claim that a probation condition is unrelated to the underlying offense or

19.

future criminality results in forfeiture of the claim on appeal. (*Id*. at pp. 230, 233–237.) Pimentel has forfeited the issue by failing to raise it with the trial court.

Even if we were to consider her claim, it is without merit. Pimentel correctly asserts that a probation condition that requires or forbids conduct which is not itself criminal is valid only if the conduct is reasonably related to the crime of which the defendant was convicted or to future criminality. (See *Welch*, *supra*, 5 Cal.4th at pp. 233–234.) But she does not identify any probation condition that regulates noncriminal conduct. Her probation terms and conditions do not, for example, require that she avoid alcohol. (Cf. *People v. Kiddoo* (1990) 225 Cal.App.3d 922, 927–928 [where alcohol was not related to crime, probation condition that the defendant not possess or consume alcoholic beverages was invalid], disapproved on other grounds in *Welch*, *supra*, at p. 237.)

Here, there is evidence that Pimentel has a history of illegal drug use, which affected her child. Of most significance, she admitted to a social worker in April 2012 that she accidentally ate a marijuana-laced brownie prior to breastfeeding A.[8]

Further, if a probation condition serves the statutory purpose of "reformation and rehabilitation of the probationer" (§ 1203.1, subd. (j)), such a condition is reasonably related to future criminality and is valid, even if it is not related to the underlying crime. (*People v. Moret* (2009) 180 Cal.App.4th 839, 851; *People v. Balestra* (1999) 76 Cal.App.4th 57, 65.) In this case, the search condition is related to Pimentel's documented drug use and is therefore valid because it serves to reform and rehabilitate her. For all of the foregoing reasons, Pimentel's challenge to the search condition fails.

---

[8]    Pimentel described additional recent drug use at trial. She testified that Lery would drug her when she did not want to work as a prostitute and that she "smoked a little weed to put [herself to] sleep" after A. was taken away on July 9, 2012. Pimentel told a probation officer "she had a prior history with marijuana abuse but would not elaborate."

20.

## ***DISPOSITION***

The judgment is affirmed.

_____

KANE, J.

WE CONCUR:

_____

HILL, P.J.

_____

GOMES, J.